UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                        :
LATATAURA LANNETTE COOPER,
                                                        :
              Plaintiff,                                            OPINION & ORDER
                                                        :
          -against-                                                18 Civ. 9949 (GWG)
                                                        :
ANDREW SAUL, Commissioner
of Social Security,                                     :

              Defendant.[1]                             :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff Latataura Lannette Cooper brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under the Social Security Act (the "Act").  Cooper and the

Commissioner both move for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c).  For the reasons stated below, Cooper's motion is granted and the

Commissioner's motion is denied.

I.  BACKGROUND

       A.  Procedural History

       Cooper filed an application for DIB and SSI benefits on March 12, 2015, alleging a

disability onset date of December 1, 2013.  See Certified Administrative Record, filed March 20,

2019 (Docket # 11) ("R."), at 259.  The Social Security Administration ("SSA") denied Cooper's

application on May 20, 2015.  R. 163.  Cooper requested a hearing before an administrative law

_____

       [1]  Andrew Saul, who became Commissioner of Social Security on June 17, 2019, is
automatically substituted as defendant pursuant to Fed. R. Civ. P. 25(d).

judge ("ALJ"). R. 171. Cooper initially appeared before the ALJ on February 2, 2017, but was granted a postponement to seek legal counsel. R. 60-83, 254-56. The full hearing before the ALJ occurred on May 4, 2017. R. 84-129. In a written decision dated June 7, 2017, the ALJ found that Cooper was not disabled within the meaning of the Act. R. 21-44. The Appeals Council denied Cooper's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1-8. Cooper timely filed this action on October 29, 2018. See Complaint, filed Oct. 29, 2018 (Docket # 1). The instant motions followed.[2]

B. The Hearing Before the ALJ

Cooper's hearing before the ALJ occurred on May 4, 2017, in Brooklyn, New York. R. 86. At the hearing, Cooper gave testimony and was represented by her attorney, Ann Bryant. R. 86. Also present and testifying was Tonya Shellow, a vocational expert ("VE"). R. 84. Before testimony was taken, the ALJ declined to admit into evidence records from Cooper's new psychotherapist because submission of those records did not comply with the "five-day rule" requiring evidence to be provided to the ALJ five business days before the hearing, see 20 CFR 404.935(a), and because the records were cumulative and did not show any new or significantly worse conditions. R. 89-90. The ALJ did, however, accept submission of updated records from Cooper's pulmonologist, Dr. Filopei. R. 90. These records indicated Cooper could stand for only 45 minutes at a time, as opposed to the original records' indication that she could stand for

---

[2] See Plaintiff's Motion for Judgment on the Pleadings, filed May 20, 2019 (Docket ## 16, 18); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, filed May 20, 2019 (Docket # 19) ("Pl. Mem."); Commissioner's Notice of Cross Motion for Judgment on the Pleadings, filed July 17, 2019 (Docket # 20); Memorandum of Law in Support of Cross Motion for Judgment on the Pleadings, filed July 17, 2019 (Docket # 21) ("Comm'r Mem."); Reply Memorandum of Law in Further Support of Plaintiff's Motion for Judgment on the Pleadings and in Opposition to Commissioner's Cross-Motion for Judgment on the Pleadings, filed Aug. 6, 2019 (Docket # 22) ("Pl. Reply").

over two hours at a time. R. 91. The updated records also indicated that Cooper could "sit for about four hours and can stand and/or walk for a total of less than two hours," R. 91, and that "she can lift and carry less than 10 pounds rarely," R. 92.

Cooper testified that she was 34 years old and lived by herself in the Bronx. R. 96. She is five-feet two-inches tall and weighs 130 pounds. R. 96. She has a driver's license but does not own a car. R. 97. She is able to take public transportation on her own, but only does so when she has to. R. 97, 107. She has a high school diploma, but only attended a year and a half of college and did not graduate. R. 97. She obtained an insurance license, but has not worked since 2012. R. 98. She got sick prior to September 11, 2001, but the terrorist attack made her medical conditions worse because she was still trying to find work at that time and not focusing on her health. R. 99.

Cooper testified as to her medical conditions and treatment. She has been diagnosed with asthma, bronchitis, anxiety, PTSD, OCD, and fibroids. R. 99. Cooper is seeing Dr. Filopei, a pulmonary specialist. R. 99. She is also going to the Sidney Hillman Family Institute of Health for mental health treatment. R. 100. Cooper's asthma prevents her from walking for long periods of time, and she can only carry one bag of groceries at a time. R. 100-01. Extremely hot and cold weather exacerbates the symptoms. R. 100-01. Cooper was recently placed on Symbicort for her asthma but also uses her nebulizer to administer albuterol nearly every day. R. 101. She uses Ventolin for emergency asthma treatment. R. 104. She takes Singulair, Mucinex, and Flonase for her allergies. R. 101. She takes Drysol for her anxiety. R. 104.

Cooper also has a fibroid uterus, and her doctors have not yet determined the best method for treating it. R. 109. The fibroid uterus does not cause her pain every day, but it does cause pain when she has her period. R. 109. Her doctors are still trying to determine whether it also

causes her to suffer from urinary tract infections.  R. 109.

Cooper was admitted to Lincoln Hospital around Christmas-time 2016 because of a kidney infection.  R. 101.  While in the hospital, Cooper suffered from a pulmonary edema, which her treating physician noted also likely caused fluid to build up in Cooper's lungs.  R. 102.  Her treating physician noted that the pulmonary edema may have been caused by the frequent injection of intravenous fluids Cooper received during her hospital stay.  R. 103.  Since being released from the hospital, Cooper has had to visit the emergency room because of kidney issues.  R. 103.

Cooper testified that she is not currently on any psychiatric medicine, and that she had two mental health appointments at "Barrier Free" in 2016.  R. 105.  Cooper believes she is unable to work because of "post-traumatic stress, the depression, and the anxiety."  R. 105.  Cooper is not sure if she suffers anxiety attacks, but sometimes gets off trains when there are too many people on them.  R. 105-06.  Occasionally, when Cooper would go to work she "just couldn't deal with it," and would go back home.  R. 106.

Cooper describes her typical day as attending doctors' appointments, visiting with her lawyer, and going to the "Coalition for the Homeless advocate."  R. 106.  Cooper is able to do her own cooking, but laundry is very difficult because Cooper struggles to push shopping carts filled with laundry, as it is very hilly near her home.  R. 107.  Grocery shopping is also difficult for Cooper because of the need to carry bags and push shopping carts.  R. 107.  Cooper considers herself "socially withdrawn" and cannot identify any friends.  R. 107.  Cooper does not "even know how long" it has been since she went to the movies.  R. 108.  She does not go to sporting events.  R. 108.  Cooper manages her own finances, which consist of public assistance and food stamps.  R. 108.

In response to questions from her attorney, Cooper testified that she can walk up about two flights of stairs before she has to use her inhaler. R. 118. She can walk about five blocks before she needs to use her inhaler, though the weather sometimes makes a difference. R. 119. Cooper walks slowly and typically sits on the subway. R. 119-20. When Cooper feels like she will have to stand for the entire ride because of a crowded subway, she sometimes will just get off the train. R. 120. Cooper cleans her own small studio apartment. R. 121. After cleaning her apartment, Cooper feels tired and sometimes has to use her nebulizer, even after wearing a mask while cleaning. R. 122. Cooper stated she would need to have her nebulizer with her at her place of employment if she worked at a full-time job. R. 122-23. As to her fibroid uterus, Cooper gets intense pain during her period every month. R. 123. Sometimes the pain is so great she cannot get out of bed or has to crawl to her kitchen. R. 123. Occasionally when it is humid out, Cooper feels like she is suffocating. R. 124. Cooper testified that indoor air conditioners and heaters also impact her asthma, and that she had to be taken away from her old insurance job by ambulance several times. R. 124. When she worked previously, Cooper would sometimes be distracted about thoughts of whether a terrorist attack similar to the 9/11 attacks would happen again. R. 125. Cooper has nightmares when sleeping, which sometimes cause her to either over-sleep or under-sleep. R. 126. Cooper states she loves to read but no longer reads because she cannot concentrate. R. 126.

The VE also testified. The VE stated that Cooper's previous insurance work would be classified as an "insurance clerk," which is a semi-skilled position with a sedentary exertional level. R. 111-12. The ALJ then posed a number of hypothetical scenarios to the VE. First, the ALJ asked the VE to

consider an individual with the claimant's age — she's been a younger individual

at all times relevant to this decision — her education — she has more than a high school education — and past work as an insurance clerk. Please consider such an individual who is limited to the following residual functional capacity: Specifically, she can lift and/or carry 10 pounds occasionally, less than 10 pounds frequently; she can sit with normal breaks for a total of six hours per eight-hour work day but can stand and/or walk, even with normal breaks for a total of just two hours per eight-hour work day. In terms of postural limitations, she should never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs and can occasionally balance, stoop, kneel, crouch, and crawl. There are no manipulative, visual, or communicative limitations for the purpose of this hypothetical. However, in terms of environmental limitations, must avoid more than occasional exposure to respiratory irritants, fumes, odors, dust, gases, industrial chemicals, poorly ventilated work environments . . . . No exposure to freezers. No exposure to work that is done exclusively out of doors. . . . Lastly, in terms of mental limitations, she is restricted to simple and repetitive tasks in a low-stress work environment, which I define as meaning no decisions or judgments can be made on executive, managerial, fiscal, or personnel-related matters, few changes in a routine work setting; only occasional interaction with the public, with coworkers, and with supervisors.

R. 113-14. The VE opined that such a hypothetical individual could not perform semi-skilled work such as Cooper's former work as an insurance clerk, and that such an individual would be limited to unskilled work. R. 114. The individual could, however, perform work in the national economy as a "document preparer," "addresser," or "lens inserter." R. 115. For a second hypothetical, the ALJ asked the VE to take the individual from the first hypothetical and "assume that such an individual could only sit for a total of four hours per eight-hour work day; can only stand and/or walk for a total of one hour; and can lift and/or carry up to 10 pounds only rarely." R. 115. The VE confirmed that, under those constraints, there would be no jobs available to such an individual in the national economy. R. 115.

The VE next responded to questions from Cooper's attorney. The VE was asked to take the individual from the first hypothetical and add a limitation "that the claimant would be off task more than 20 percent of the work day because of physical impairments." R. 116. The VE determined that there would be no jobs in the national economy for such an individual. R. 116.

6

The attorney asked the VE to take the individual from the first hypothetical and add a limitation that the individual be "off task at 15 percent." R. 116. The VE stated the off-task threshold for unskilled work is 15 percent, and a rate above that would preclude jobs in the national economy. R. 116. The VE was next asked to take the first hypothetical individual and add the limitation that the individual "be absent from work one time every week" for necessary doctor's appointments. R. 116-17. The VE determined that there would be no jobs in the national economy for such an individual. R. 117. Lastly, the VE was asked to take the first hypothetical individual and add the limitation that the individual would be late to work one day or more per week. R. 117. The VE responded that such an individual would likely be terminated for being late if the behavior persisted after being reprimanded. R. 117. The VE noted that her testimony "regarding the absences and being late to work" was based on the VE's work experience and published literature on the subject and was "not contained within the DOT." R. 117.

## C. The Medical Evidence

The Commissioner and Cooper have both provided summaries of the medical evidence in the record. See Comm'r Mem. at 2-11; Pl. Mem. at 3-6. The summaries are substantially consistent with each other. In any event, the Court directed the parties to specify any objections they had to the opposing party's summary of the record and neither party has done so. See Scheduling Order, filed April 11, 2019 (Docket # 14) ¶ 5. Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in section III below.

## D. The ALJ's Decision

The ALJ denied Cooper's DIB and SSI applications on June 7, 2017. R. 24-38. First, the

ALJ found that Cooper met the insured status requirements of the SSA though March 31, 2016. R. 25, 27.  Then, following the five-step test set forth in SSA regulations, the ALJ found at step one that Cooper had not engaged in "substantial gainful activity" during the time between her alleged disability onset date — December 1, 2013 — and the date of the decision (the "relevant period").  R. 27.  At step two, the ALJ found that during the relevant period, Cooper suffered from "severe impairments" of "[a]sthma, fibroid uterus, major depressive disorder, and post-traumatic stress disorder."  R. 27.

At step three, the ALJ found that none of Cooper's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  R. 28-29.  In reaching this conclusion, the ALJ gave particular attention to listings 3.03 (Asthma), 13.23 (Malignant Neoplastic Diseases), 12.04 (Depressive, bipolar and related disorders), and 12.15 (Trauma- and stressor-related disorders).  R. 26-38.

With respect to listing 3.03 (Asthma), the ALJ determined Cooper did not satisfy the requirements of the listing because spirometry (pulmonary function testing) was essentially normal on March 13, 2017, and because Cooper had not been admitted to a hospital the necessary number of times.  R. 28.  The ALJ noted that Cooper's eight-day hospital stay at Lincoln for kidney infection appeared unrelated to Cooper's underlying asthma.  R. 28.

The ALJ concluded there is no applicable listing for Cooper's fibroid uterus but the ALJ considered listing 13.23 and determined that listing's requirements were not "met or medically equaled in this record."  R. 28.

With respect to listings 12.04 (Depressive, bipolar and related disorders) and 12.15 (Trauma- and stressor-related disorders), the ALJ analyzed whether the "paragraph B" criteria of the listings were met as to Cooper's mental disorders under these listings.  R. 28; see 20 C.F.R.

8

Part 404, Subpart P, Appendix 1 §§ 12.04, 12.15. To meet those criteria, a claimant must show that the mental impairments result in "at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." R. 28; see 20 C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.04, 12.15.

In understanding, remembering, or applying information, the ALJ concluded Cooper was "significantly limited, but not to a marked or extreme degree." R. 29. The ALJ considered the fact that Cooper presented with moderately impaired recent and remote memory skills at the May 11, 2015 psychological consultive examination, but that Cooper said she spent the day reading. R. 28. The ALJ also considered the fact the Cooper stated that she enjoys reading, even though she reads less than she used to. R. 29.

In interacting with others, the ALJ concluded Cooper had moderate limitations. R. 29. The ALJ noted that Cooper stated she was anxious in crowds both in the hearing as well as in the May 11, 2015 psychological consultive exam. R. 29. The ALJ also noted that Cooper was capable of taking public transportation as well as attending multiple appointments in a day. R. 29.

The ALJ determined Cooper was not markedly or extremely limited in her "concentrating, persisting, or maintaining pace" abilities. R. 29. The ALJ considered Cooper's testimony that she had a decreased attention span. R. 29. The ALJ also noted that during the May 11, 2015 psychological consultative exam, Cooper displayed intact attention and concentration. R. 29. The ALJ further considered the fact that Cooper did not report any complaints to her treating psychiatrist and that Cooper's psychiatrist did not make any positive mental status examination findings. R. 29.

9

The ALJ also determined Cooper was not markedly or extremely limited in her ability to adapt or manage herself.  R. 29.  The ALJ noted that the record indicated Cooper has lived independently since September 2015 and is able to do most household chores.  R. 29.

The ALJ next assessed whether the "paragraph C" criteria were satisfied.  R. 29.  The ALJ considered the fact that Cooper had not obtained mental health treatment since September 16, 2015, as well as the fact that Cooper had been able to conduct daily activities, and determined the "paragraph C" criteria were not satisfied.  R. 29.

Before moving to step four, the ALJ addressed Cooper's residual functional capacity ("RFC").  R. 29-36.  The ALJ noted that he must first determine "whether there [was] an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  R. 30.  Second, the ALJ noted that he must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  R. 30.  The ALJ found that Cooper had the RFC "to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)."  R. 29.  The ALJ found that Cooper could: 1) "lift and/or carry 10 pounds occasionally, less than 10 pounds frequently," 2) "sit, with normal breaks, for a total of 6 hours per 8-hour workday," 3) but could "only stand and/or walk, even with normal breaks, for a total of just 2 hours per 8-hour workday."  R. 29-30.  The ALJ found that Cooper had various other postural, environmental, and mental limitations.  R. 30.  In making the RFC determination, the ALJ considered Cooper's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," R. 30-31; the objective medical evidence and other evidence, R. 31-35; and opinion evidence in accordance with SSA regulations, R. 35-36.  The ALJ concluded that "the claimant's medically

10

determinable impairments could reasonably be expected to cause the alleged symptoms" but "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely consistent with the evidence of record."  R. 33.

With respect to opinion evidence, the ALJ gave great weight to the opinions of Drs. Yevsikova and Thomas, the consultive examiners, because the ALJ found they were consistent with their clinical observations, treatment notes, and Cooper's daily activities.  R. 35.  The ALJ gave great weight to the May 19, 2015 mental status assessment by Dr. Shapiro because it was consistent with Dr. Thomas's report as well as Cooper's description of her daily activities. R. 35.  The ALJ gave "no more than some weight" to the GAF[3] scores of 40 and 45 because they were inconsistent with the lack of psychiatric treatment and mental status positive signs; however he gave greater weight to the GAF score of 61 because it correlated with Dr. Thomas's report as well as Cooper's daily activities.  R. 35.  The ALJ gave little weight to the initial opinion of Dr. Filopei, because it was superseded by his second opinion the next day.  R. 35. The ALJ gave "no more than some weight" to Dr. Filopei's second opinion because it was based on only two examinations and those examinations showed "benign physical examination findings," "negative CT-scan signs," and "mostly negative pulmonary function test results." R. 35-36.  The ALJ stated he gave no consideration to the May 19, 2015 physical residual

---

[3]  A GAF, or "global assessment of functioning," score is a scale that was "promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alterations in original) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM") 32 (4th ed. 2000)).  "GAF scores may be relevant to an ALJ's severity and RFC determinations, although they are intended to be used to make treatment decisions . . . and not disability determinations."  Gonzalez v. Colvin, 2016 WL 4009532, at *5 (W.D.N.Y. July 27, 2016) (alteration in original) (internal quotation marks and citation omitted). As reflected in the Fifth Edition of the DSM, published in 2013, the GAF scale is "no longer in use."  Kaczkowski v. Colvin, 2016 WL 5922768, at *12 (S.D.N.Y. Oct. 11, 2016).

functional capacity assessment because it was prepared by a state agency "single decision-maker" and not a medical consultant.  R. 36.

Having determined Cooper's RFC, the ALJ concluded based on the VE's testimony that Cooper could not perform her past work as an assistant underwriter or sales clerk.  R. 36.  At step five, the ALJ considered Cooper's RFC and her age, education, and work experience in determining there is "other work that exists in significant numbers in the national economy" that Cooper could perform.  R. 38.  Specifically, although the ALJ found that Cooper's "ability to perform all or substantially all of the requirements of [sedentary] work has been impeded by additional limitations," given all the evidence in the record, including testimony from the VE, the ALJ found that Cooper could perform the requirements of representative occupations such as "document preparer," "addresser," or "lens inserter."  R. 37.  Accordingly, the ALJ concluded that Cooper was not disabled as defined by the Act.  R. 38.

II.  GOVERNING STANDARDS OF LAW

A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is disabled."  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).  Rather, a court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

B.  Standard Governing Evaluation of Disability Claims by the Agency

The Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments

that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience.  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Physician" Rule

Under the so-called "treating physician" rule,  the ALJ must generally give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[4]

---

[4]  Although the SSA has since revised its rules to eliminate the treating physician rule, because the claim here was filed before March 27, 2017, the rule applies in this case.  See, e.g., Conetta v. Berryhill, 365 F. Supp. 3d 383, 395 n.5 (S.D.N.Y. 2019).

Treating sources, which includes some professionals other than physicians, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The Second Circuit has summarized the deference that must be accorded the opinion of a "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion.  First, the ALJ must decide whether the opinion is entitled to controlling weight.  "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.  In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion."  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . .  An ALJ's failure to "explicitly" apply the Burgess factors when assigning weight at step two is a procedural error.  Selian, 708 F.3d at 419-20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; accord Estrella,

925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

Nonetheless, the Commissioner is not required to give deference to a treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citation omitted). In fact, "the less consistent [a treating physician's] opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted). Finally, a "slavish recitation of each and every [factor listed in 20 C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the "Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to affirm the decision if "'the substance of the treating physician rule was not traversed.'" Estrella, 925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

D. Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399) (additional citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval

Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when

discounting a claimant's credibility regarding his or her residual functional capacity, regulations

impose some burden on the ALJ to explain his or her decision.  As the Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of pain and other limitations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir.
> 1980), but is not required to accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the credibility of the claimant's
> testimony in light of the other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529.  To evaluate a claimant's assertion of a

limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a
> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [her] impairment(s), [her]
> restrictions, [her] daily activities, [her] efforts to work, or any other relevant
> statements [she] make[s] to medical sources during the course of examination or
> treatment, or to [the agency] during interviews, on applications, in letters, and in
> testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see
> also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting

the ability to work by a claimant for disability benefits.  20 C.F.R. § 404.1529(c).  These

regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the

intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms

have on [her] ability to work solely because the available objective medical evidence does not

18

substantiate [her] statements." <u>Id.</u> § 404.1529(c)(2). The regulations also provide that the SSA

"will consider whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [a claimant's] statements and the rest of the evidence." <u>Id.</u>

§ 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding

"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the

record." <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing

<u>Carroll</u>, 705 F.2d at 643); <u>accord</u> <u>Craig</u>, 218 F. Supp. 3d at 263. The ALJ must make this

determination "in light of medical findings and other evidence[ ] regarding the true extent of the

pain alleged by the claimant." <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984) (internal

quotation marks omitted) (quoting <u>McLaughlin</u>, 612 F.2d at 705). However, where an ALJ gives

specific reasons for finding the claimant not credible, the ALJ's credibility determination "is

generally entitled to deference on appeal." <u>Selian</u>, 708 F.3d at 420 (citing <u>Calabrese v. Astrue</u>,

358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's]

findings are supported by substantial evidence, the court must uphold the ALJ's decision to

discount a claimant's subjective complaints." <u>Aponte v. Sec'y, Dep't of Health & Human</u>

<u>Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); <u>see also</u> 42 U.S.C. § 405(g)

("The findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive . . . .").

III. <u>DISCUSSION</u>

Cooper makes four arguments in support of her motion for judgment on the pleadings: 1)

that the ALJ improperly relied on the VE's testimony because that testimony was based on an

RFC that was unsupported by substantial evidence, Pl. Mem. at 10-16; 2) that the ALJ failed to

follow SSR 16-3p, Pl. Mem. at 16-18; 3) that the ALJ failed to provide "good reasons" for rejecting a treating physician's opinion, Pl. Mem. at 18-20; and 4) that the ALJ improperly substituted his own lay opinion for that of a medical expert, Pl. Mem. at 20-21.  We address these arguments in turn.

A.  Reliance on VE Testimony Based on RFC Unsupported by Substantial Evidence

Cooper argues the RFC was unsupported by substantial evidence because the ALJ relied on a vague finding by Dr. Yevsikova that Cooper had "mild limitations to prolonged walking, prolonged standing, prolonged sitting."  See Pl. Mem. at 13 (quoting R. 658).

The Second Circuit has held that when compiling an RFC from the record, an ALJ may not rely on opinions that employ the terms "moderate" and "mild" absent additional information. Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) (such terms are "so vague as to render [them] useless"); accord Selian, 708 F.3d at 421 (concluding that an ALJ, in determining claimant's RFC, could not rely on the "remarkably vague" opinion of a consulting physician that the claimant "should be able to lift . . . objects of a mild degree of weight on an intermittent basis.") (citing Curry, 209 F.3d at 123-24; Garretto v. Colvin, 2017 WL 1131906, at *21 (S.D.N.Y. Mar. 27, 2017) ("[The consulting physician's] use of the word 'moderate' is vague and provides no support for the ALJ's conclusion that plaintiff engage in these activities for six hours out of an eight hour day.") (citation omitted); Young v. Comm'r of Soc. Sec., 2014 WL 3107960, at *9 (N.D.N.Y. July 8, 2014) (conclusion by single consulting physician that claimant had undefined "moderate" limitations in sitting not substantial evidence for finding that claimant could perform sedentary work); Richardson v. Astrue, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (consulting doctor's vague conclusion that "[plaintiff's] ability to sit was 'mildly to moderately' impaired . . . provides no support for ALJ['s] conclusion that [plaintiff] could perform sedentary

work."); see also Burgess, 537 F.3d at 128-29 (noting that the opinion of a medical expert is not "sufficiently substantial to undermine the opinion of the treating physician," when such an opinion vaguely describes an impairment with words such as "mild" or "moderate") (citing Curry, 209 F.3d at 123).

Here, it is not "obvious" that a mild limitation on sitting "translates into a set number of hours." Perozzi v. Berryhill, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018) (addressing a "moderate" limitation). There is simply insufficient information in Dr. Yevsikova's four-page opinion to allow a finding that Cooper can sit for a six-hour period. As noted, Dr. Yevsikova opined that "[t]he claimant has mild limitations to prolonged walking, prolonged standing, prolonged sitting." R. 658. Dr. Yevsikova did not further clarify Cooper's limitations other than to note Cooper's "Cervical spine shows full flexion, extension, lateral flexion bilaterally" and that Cooper did not have "scoliosis, kyphosis, or abnormality in thoracic spine." R. 657. This lack of information could not properly have been used to reject Dr. Filopei's opinion (even though, as explained below, we do not believe it was to be accorded weight as that of a treating physician) that Cooper would only be able to sit for four hours and stand and/or walk for fewer than two hours per eight-hour work day. R. 1305. Accordingly, the ALJ has not established that the RFC as found by the ALJ is supported by substantial evidence.

The cases cited by the Commissioner to the contrary are all distinguishable. See Comm'r Mem. at 23. In Quintana v. Berryhill, 2019 WL 1254663, at *17 (S.D.N.Y. Mar. 19, 2019), the consulting physicians used the terms "mild" and "moderate" but also "included additional information to show how these limitations would affect Plaintiff's RFC." There is no additional information in Dr. Yevsikova's report that explains how the "mild" and "moderate" limitations will impact Cooper's RFC. Similarly, in Jordan v. Comm'r of Soc. Sec., 2018 WL 1388527, at

*9 (S.D.N.Y. Mar. 19, 2018), the ALJ explicitly noted that the consulting physician's assessment

was "vague" but explained that the "clinical observations that were made" were consistent with

the RFC.  The ALJ did not undertake such an analysis here.  In Harrington v. Colvin, 2015 WL

790756, at *15 (W.D.N.Y. Feb. 25, 2015), plaintiff's ability to sit, stand or walk up to six hours

per day was supported by other substantial evidence in the record, and the ALJ supported his

determination with an extensive discussion of plaintiff's treatment notes.  No such discussion is

present here.

B.  Failure of ALJ to Follow SSR 16-3p

Cooper argues the ALJ, in violation of SSR 16-3P, failed to consider her reasons for her

non-compliance with medical treatment.  Pl. Mem. at 16-18.  In relevant part, SSR 16-3p

provides that:

> if the frequency or extent of the treatment sought by an individual is not
> comparable with the degree of the individual's subjective complaints, or if the
> individual fails to follow prescribed treatment that might improve symptoms, we
> may find the alleged intensity and persistence of an individual's symptoms are
> inconsistent with the overall evidence of record.  We will not find an individual's
> symptoms inconsistent with the evidence in the record on this basis without
> considering possible reasons he or she may not comply with treatment or seek
> treatment consistent with the degree of his or her complaints.  We may need to
> contact the individual regarding the lack of treatment or, at an administrative
> proceeding, ask why he or she has not complied with or sought treatment in a
> manner consistent with his or her complaints.

Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR

16-3P (S.S.A. Oct. 25, 2017).  The problem of drawing negative inferences from a failure to seek

or pursue regular treatment is particularly important in cases involving psychological issues

because, as previous courts have recognized, "a person who suffers from psychological and

emotional difficulties may lack the rationality to decide whether to continue treatment or

medication."  Williams v. Colvin, 2016 WL 4257560, at *3 (W.D.N.Y. Aug. 12, 2016) (internal

quotation marks and citations omitted).

Here, the ALJ noted that Cooper did not make any medical visits from July 2013 to July 2014, and from September 2015 until January 2017. R. 33. The ALJ also noted that Cooper had no mental health treatment after September 16, 2015. R. 33. The ALJ appeared to use these facts to determine the severity of Cooper's condition. R. 33-34. During the hearing, the ALJ never asked Cooper about her sporadic attempts to obtain psychological treatment. R. 84-129.

Cooper argued in her opening memorandum that the ALJ failed to comply with SSR 16-3P. Pl. Mem. at 16-18. The Commissioner, however, did not even address this argument in his responsive brief. This failing was pointed out by Cooper in her reply memorandum. Pl. Reply at 3. The Court invited the Commissioner to submit a response to the plaintiff's reply. See Scheduling Order, filed April 11, 2019 (Docket # 14). The Commissioner, however, did not file any response at all. Accordingly, we deem the Commissioner to have conceded that there was error in this particular instance. On remand, the ALJ should inquire as to the reason for Cooper's gaps in treatment.[5]

C. Failure of ALJ to Provide Good Reasons to Reject Opinion of Treating Physician

Cooper argues remand is warranted because the ALJ did not explain how the opinion of her treating physician, Dr. Filopei, was inconsistent with her activities of daily living. Pl. Mem. at 18-20.

As already noted, under the so-called "treating physician" rule, the ALJ must normally

---

[5] In light of this ruling, we do not reach Cooper's contention, Pl. Mem. at 14-16, that the ALJ improperly considered her GAF scores given that the ALJ's evaluation of Cooper's mental condition may affect how these scores are considered. We do note, however, that "GAF scores may be relevant to an ALJ's severity and RFC determinations, although they are intended to be used to make treatment decisions . . . and not disability determinations." See Gonzalez, 2016 WL 4009532, at *5 (alteration in original) (internal quotation marks and citation omitted).

give "more weight to medical opinions" from a claimant's "treating source." 20 C.F.R. § 404.1527(c)(2). The ALJ must first decide whether the treating physician's opinion is entitled to "controlling" weight. Estrella, 925 F.3d at 95 (citing Burgess, 537 F.3d at 128). If the ALJ finds the opinion not to be entitled to controlling weight, the ALJ must determine "how much weight, if any" to accord the opinion, explicitly considering the "'Burgess factors,'" id. at 95-96 (quoting Selian, 708 F.3d at 418, and citing Burgess, 537 F.3d at 129), and giving "good reasons" for the determination, id. at 96 (quoting Halloran, 362 F.3d at 32). As defined in the regulation, "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

As a threshold matter, the Commissioner questions whether Dr. Filopei qualifies as a treating physician because his opinion was only based on two examinations. Comm'r Mem. at 20. Cooper does not respond to this argument in her reply brief. A claimant's medical provider – or "source" to use the regulations' terminology — constitutes a "treating" physician "when the medical evidence establishes that [the claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." 20 C.F.R. § 404.1527(a)(2). "[A]n acceptable medical source who has treated or evaluated [the claimant] only a few times or only after long intervals (e.g., twice a year)" may "be [the claimant's] treating source if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." Id.

Here, Cooper saw Dr. Filopei only twice for her pulmonary issues, and such limited interaction is typically insufficient, without more, to establish a treating physician relationship.

See Nunez v. Berryhill, 2017 WL 3495213, at *23 (S.D.N.Y. Aug. 11, 2017) ("A physician who has examined a claimant on one or two occasions is generally not considered a treating physician.") (citing 20 C.F.R. § 404.1527(a)(2)); accord Patterson v. Astrue, 2013 WL 638617, *8 (N.D.N.Y.) ("three examinations by [a physician] over the course of four months . . . does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), adopted, 2013 WL 592123 (N.D.N.Y. 2013); Cascio v. Astrue, 2012 WL 123275, *3 (E.D.N.Y. 2012) ("[T]wo isolated visits, approximately one year apart, did not constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician] to qualify as a treating physician.").

Further, to the extent Cooper intends to argue that Dr. Filopei should be considered a treating physician because, despite the limited number of times he examined her, he is the medical professional "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)" and that Dr. Filopei "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations," Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)), we reject that argument. Dr. Filopei's examination notes underscore the lack of unique information he possessed about Cooper's treatment. He was "unable to assess," inter alia: whether Cooper's medications had implications on her ability to work, R. 1281; how often Cooper would need to take breaks during a workday, R. 1281; whether Cooper could twist, stoop, crouch, or climb, R. 1282; and how often Cooper would be off task, R. 1282. Accordingly, the brief physician-patient relationship between Cooper and Dr. Filopei, as well as the limited substantive nature of his findings, reflect that Dr.

Filopei was not a treating physician. Thus, the ALJ did not err in not according Dr. Filopei's opinions the weight due to a treating physician.

### D. Improper Substitution of ALJ's Lay Opinion For Medical Expert Opinion

Cooper argues the ALJ impermissibly substituted his own opinion for that of a medical expert when determining Cooper's RFC "because the ALJ could not rely on Dr. Yevsikova's vague opinion." Pl. Mem. at 20. We have already held Dr. Yevsikova's opinions are too vague to constitute substantial evidence supporting the RFC. In light of this determination, we believe it is not necessary to address the issue of whether there was an improper substitution of the ALJ's opinion. On remand, we assume that the ALJ will not "arbitrarily substitute his own judgment for competent medical opinion," Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citation and internal quotation marks omitted), but rather will "choose between properly submitted medical opinions," Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998).

### IV. CONCLUSION

For the foregoing reasons, Cooper's motion for judgment on the pleadings (Docket ## 16, 18) is granted and the Commissioner's cross-motion for judgment on the pleadings (Docket # 20) is denied. The case is remanded for further proceedings consistent with this Opinion.

SO ORDERED.

Dated: New York, New York
March 12, 2020

GABRIEL W. GORENSTEIN
United States Magistrate Judge